# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **BYHEART, INC.** | § | **3:26-CV-00069** |
| | § | |
| **V.** | § | **9:00 A.M. TO 9:24 A.M.** |
| | § | |
| **DAIRY FARMERS OF** | § | |
| **AMERICA, INC.** | § | **MARCH 13, 2026** |

**HEARING ON MOTION VIA VIDEO CONFERENCE**
**BEFORE THE HONORABLE ANDREW M. EDISON**
**Volume 1 of 1 Volume**

**APPEARANCES:    (All parties appeared via video conference)**

**FOR THE PLAINTIFF:**
Attorney Daniel Benjamin Levin
Attorney Jessica Olivia Laird
Munger, Tolles & Olson
350 S. Grand Avenue, 50th Floor
Los Angeles, California 90071
(213) 683-9135
daniel.levin@mto.com
jessica.laird@mto.com

**FOR THE DEFENDANT DAIRY FARMERS OF AMERICA, INC.:**
Attorney Bruce Davidson Oakley
Hogan Lovells US LLP
609 Main Street, Suite 4200
Houston, Texas 77002
(713) 632-1420
bruce.oakley@hoganlovells.com
        and
Attorney Lauren S. Colton
Hogan Lovells US LLP
100 International Drive, Suite 2000
Baltimore, Maryland 21202
(410) 659-2700
lauren.colton@hoganlovells.com

Court Reporter:
Laura Wells, RPR, RMR, CRR, RDR
601 Rosenberg, Suite 615
Galveston, Texas 77550

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**(The following proceedings held via video conference.)**

THE COURT:  Let's go on the record.  Good morning, everyone.  This is the United States District Court for the Southern District of Texas.  We're here on case 3:26-CV-69, ByHeart, Inc. v. Dairy Farmers of America, Inc.

Could I get introductions of counsel, starting with ByHeart, Inc., please.

MR. LEVIN:  Good morning, Your Honor.  Daniel Levin from Munger Tolles & Olson on behalf of ByHeart and also on the video is Jessica Laird, my colleague from Munger, Tolles & Olson, for ByHeart.

THE COURT:  Great to see both of you.

And on the DFA side?

MR. OAKLEY:  Your Honor, Bruce Oakley along with my partner Lauren Colton on behalf of the respondent here DFA.

THE COURT:  Great to see you, as well.

Okay.  So this case, obviously, was in Nevada, got transferred here.  I saw it; and I thought, hey, let's have a quick status conference, sort of figure out where we are, because I know we have the underlying case.  And I guess we'll get to the discovery dispute in a second.

But shouldn't this case be consolidated with the underlying case?  And I guess my initial thought was talk

about the discovery dispute, get a resolution, and then consolidate this into that case because I know you -- it seems to me, if there is an MDL proceeding, it would be good to have everything in one place.

I am curious as to your thoughts each.

MR. LEVIN:  Sure, Your Honor.  Let me address that.  The bottom line is I think that's fine, and it makes sense.  The history here, of course, is we have got a Rule 45 subpoena and ended up filing a motion to compel before DFA was added to the party.  Right.  So it got a life of its own.

At this point, you are right, I think it probably does make sense to consolidate it into the underlying case.  I think, in either event, you know, our practical sort of point is, you know, we would like resolution sooner rather than later but probably makes sense to get it under one case number.  It seems like that is probably efficient.

THE COURT:  Understood.

Mr. Oakley and Ms. Colton, agree or disagree?

MR. OAKLEY:  Your Honor, from our perspective it would ultimately make sense for them to be consolidated. We have not yet been served or appeared in that case; and obviously, we do want to reserve our rights to file a motion to dismiss on all issues, including personal jurisdiction.

*Laura Wells, RPR, RMR, CRR, RDR*

But the sort of predicate issue is, you know, the fact that there is not an emergency now and not an emergency basis to seek the relief they are seeking and the MDL hearing is scheduled.

THE COURT:  I understand that.  I guess what I'm just saying is it seems to me -- here is what I would like to do.  I would like to sort of talk about this discovery dispute, resolve this discovery dispute; and then, at the conclusion of this hearing, consolidate the cases together really thinking that -- and I know you have an MDL hearing coming up later this month which, by the way, have any of you ever been in an MDL -- argued an MDL hearing?

MR. OAKLEY:  Yes.  For about 90 seconds, right?

THE COURT:  I argued one in Baltimore, actually. It was literally -- I think they gave me four minutes. They literally -- it's like --

MR. LEVIN:  They are very efficient with their time.

THE COURT:  It was unbelievable.  Like, you can't -- you say your name, and then they are like -- the red light goes on.  But I digress.

Okay.  Let's talk about this discovery dispute here. So baby formula recalled due to this infant botulism outbreak, multiple cases filed across the country.  I think there are approximately 20.  I know the plaintiffs

filed a request to have this MDL up in the Southern District of New York. I know the MDL panel is going to hear the argument later this month.

I'm just curious: Is anyone opposed to the MDL?

MR. LEVIN: No. I don't think -- there is varying views on it and where it should be consolidated and that sort of thing; but I don't think anyone is going to oppose. I don't know what the panel -- sometimes it denies unopposed motions.

THE COURT: Understood. Understood. And usually a lot of times it's the location that everyone is arguing on. Nonetheless, that will be decided in due course by the MDL panel.

So what we are here today -- and I fully realize, Mr. Levin, that at the time the subpoena was issued, DFA was not part of this underlying case. So this wasn't an effort to try to, hey, let's sneakily get this out of Texas and file it in Nevada. I totally understand that.

So there are two issues on the subpoena, the way I see it.

One, you all seek various documents.

And two, you seek product retains to conduct some testing. So let me ask you about the documents first. Now that DFA is in the case, I mean, DFA has certain document preservation requirements, right? They can't

destroy things or there is spoliation.

And focusing on the documents specifically, my question is:  What is the rush?  Meaning, isn't the whole purpose of MDL proceedings to consolidate discovery in one location so not to have multiple proceedings with possibly conflicting orders?  Why not, at least on the documents, hey, let's just see what happens in the MDL, do this once, and go on from there?

MR. LEVIN:  Your Honor, I guess my response to that would be I completely agree we're going to do it once.  We're not going to come -- they are going to produce whatever documents they have, you know, related to the testing and we really have narrowed this.  So we came in, and our subpoena was broader.  We have tried to be cooperative on this.

They are going to produce some wants at some point.  I don't see sort of a basis for -- they have never made a burden argument.  They haven't put in a declaration.  They didn't put in any evidence on a burden argument.  So I don't really see, other than sort of delay for the sake of delay, maybe something goes their way, I don't really see sort of the why.

I suppose, you know -- so it seems like if we get the documents now, we have them now.  If they put it off, then they produce the documents later.  I agree they are under

a preservation obligation. I think they have been under one since we first, you know, asked about it months ago.

And so I am just not seeing sort of, on this one, a particular efficiency of saying, okay, let's wait, let's sort of kick it out into the future. At some point I think they are going to have to produce these documents. I don't think they can put it off forever.

And so without some burden argument with evidence, which they have not done, I don't see what the basis is for saying let's just wait because procedurally other things are going to happen.

I mean, the court in Nevada made the point -- they argued mootness, legal mootness, and the court in Nevada rejected that when it transferred it back here.

So that's kind of our perspective on this. And I understand we want to be practical, we want to be efficient; but I'm just not seeing a practical efficiency to waiting here.

THE COURT: Mr. Oakley and Ms. Colton.

MR. OAKLEY: I think the issue here is scope and overbreadth and timing. We haven't had the 26(f) meeting at this point. They are not limiting the subpoena to the documents relevant to this particular child. There are multiple other plaintiffs out there. And so it makes sense to us to have it all coordinated.

We also did tender some screening test results, which they rejected.  So we are in this meet-and-confer process about scope and proportionality and breadth; and we're going to have to do that again, once we are dealing with the plaintiffs' committee and the MDL.

And it makes sense, from our perspective, to do that one time since they have sort of rejected our offer with respect to scope here.

MR. LEVIN:  I'm actually not totally certain what Mr. Oakley is referring to.  We've really narrowed the scope down to things related to botulism.  So I am not -- and they have never given us any documents and they have never put in any evidence here but burden.  They've put in sort of assertions in their briefing, but there is no declaration.

And so I'm just like -- I'm just not understanding, other than every time we get on the phone or have a brief from them, they have a reason to put this off.  And it's changed over time.  But at some point, you know, you sort of run out of the ability to say, well, we're still conferring on this.

I just -- I am just sort of not seeing it, and I really don't see how the documents -- no document is going to connect to this individual plaintiff, right.  Their point about the individual plaintiff is, well, you know,

you could link a batch of ByHeart formula back to a batch of organic milk powder and that -- that might be true sometimes.

But in this case, we don't have -- we don't know what cans this particular plaintiff consumed. So, therefore, what we have is a question of sort of circumstantial evidence. How do we tie back, you know, botulism contamination? And it makes sense to say at that point you need to look and see, okay, what is the scope of the raw material that was used in the product, which is this organic milk powder.

We know from other testing that it ties back to lots that came from DFA, that DFA processed; but the -- you know, the particular lot that tested positive was not actually used in the finished product of ByHeart.

So then the question is, okay, we'd like now to tie the lots to look at lots that were used in ByHeart. Is there contamination in those or not? We don't know what the testing is going to show. But that's -- and, you know, I know I'm going between documents and testing, Your Honor. I'm trying to stay focused.

But it's important to look at the documents and say, okay, well, what were they doing and what were they not doing? That's all relevant, and I don't really see how it's going to tie to one particular person versus another.

It's going to all go to sort of how we tie back to where the contamination came from.

THE COURT:  I guess my question really is this: I'm not disagreeing that a request for documents is potentially relevant.  As I understand it, you sent a subpoena.  They think it's too broad.  There have been discussions.  I'm just really curious.  If those documents exist, why should I get involved?  I mean, I think the one place we know this case isn't going to get sent by the MDL panel is to the Southern District of Texas and Galveston Island.

So why not actually let the plaintiffs get involved in this dispute?  Whatever court eventually is going to handle the underlying discovery disputes, it just seems to me why don't we let them?  If there is no risk of the documents being lost -- and I fully understand and appreciate your desire to let's -- hey, let's get this moving, let's get this going.  I guess I'm just curious how -- I mean how --

MR. LEVIN:  Well, let me give one practical example to Your Honor.  I really do.  I understand, you know, you are trying to drive at sort of practicality here.

As DFA knows, we are doing an early mediation next week.  They are not participating.  They have chosen not

to.  A number of the plaintiffs are, other defendants.  We are working to try to make progress in this case.  And understanding, you know, some of these fact issues, other people have voluntarily provided things, DFA has chosen not to, that will -- that will push this case forward, you know.

So that is really -- we are trying to -- we are a small company, right.  We are -- we have -- we sell one product.  That product is not on the shelves.  You can imagine where that puts, you know, my client.

So we are really trying to move quickly.  We don't have the luxury of sitting around and waiting while the litigation plays out over a, you know, long -- so sort of efficiency and speed is really, really important to us being able to get through this.  I'll be really blunt about it.

So that's -- that is -- that is important to us.

MR. OAKLEY:  And just to respond to that, Your Honor.  We have voluntarily supplied information to the FDA.  The FDA has taken part of our retains and has done testing on them.  They have inspected our facility.  There were no regulatory findings that came out of that.

There are going to be a number of issues with respect to Organic West, you know, the farms that supplied this to us.  The big question is about our drying process.  There

will be questions about their controls or lack of controls. And so all of those issues are out there and need to be addressed by -- and there are now additional defendants, not just Organic West but also the retailers. And it seems to us that it makes sense to address all of these issues regarding scope and proportionality one time.

THE COURT: Okay. Let me ask you this. Let's turn to the testing issue. And I fully understand that ByHeart wants to conduct testing of the product retains. Candidly, it seems understandable. It seems relevant, more importantly. That said, I guess, what is the rush?

I guess here is my specific question, right. I can't remember what brief I saw it, whether it was in -- it was probably something that was filed in Nevada. But DFA makes the point that once the case is transferred to the MDL then all interested parties can discuss appropriate testing and protocol for whatever remains out there, subject to any supervision of whatever court handles the case.

Do these product retains do they degrade over time? In other words, is there some reason, other than understandably your desire for efficiency and speed, Mr. Levin, is there a reason why the testing couldn't be completed later this year, for example, when everything was consolidated?

*Laura Wells, RPR, RMR, CRR, RDR*

MR. LEVIN:  Well, I think the real risk is as you store these there is always the risk of outside influences, contamination, does air get in there, did things change in the sample.  So, yes, there is risk in terms of waiting.  You potentially have degradation of the samples.  I think we explained that in the Mullane declaration.

So there is risk of time in terms of getting a result back.  The longer you wait, you run -- you run risk of getting a sample back.

I just want to come back, though, to this point.  Every time we talk, every brief they file, there is something that they say, well, we need to talk to more people.  We need to do some more things.  They have never -- two things have never happened in this dispute.

One, no other party has ever showed up and said, "Wait."  They say, "Well, maybe FDA.  FDA knows this is happening."  They have never shown up and said anything.  The plaintiffs are not objecting.  No other defendant.  Everyone knows we're out here trying to get the samples.  No one shows up.

And, two, they have some -- other than just talking about an urgent delay, they have some responsibility to come in and present you with some evidence; and they haven't -- they have filed five briefs, and they have

never done that.  They have just said, well, we just need to wait.  And, frankly, I think -- I think they are hoping that if they wait long enough, we will be gone and that we will be a thorn out of their side.  And that's -- that's really not a fair way to litigate.  It just isn't.

So, you know, it's -- I think my client is sort of frustrated that all we're getting is just these sort of, well, you know, six months from now, four months from now, eight months from now.  And by the way, there is -- you know, if it's consolidated, you know, great.  If it's not, I think I heard Mr. Oakley say they are going to resist personal jurisdiction in this court.  I mean, we are just going to have -- so then we are going to be in this court fighting about that.

I think they've waived it by basically urging the Nevada court to send it over here to buy time but, you know, we're going to fight about that.  So from our perspective, it's sort of, here we are.  No one else is standing up and saying we need to wait or that they have some other thing.  Obviously, the testing is everyone is going to get the test results, you know.  So it's going to go to a lab that the FDA is relying on.  It just seems like to what end, other than some hope, that maybe this goes away.

MR. OAKLEY:  Well, I mean, one way not to

litigate is to mischaracterize arguments and to assume bad intent.

I mean, the bottom line here is that just as they sought an extension on their time to file a motion to dismiss, so did we. And so I'm not saying we are going to file anything or not. We're just preserving those rights.

There is also protocols involved in testing; and I think it may be that what you saw, Judge Edison, was the order from the Nevada judge, Judge Weksler, who says that she understood the deadlines here had been vacated, which means the 26(f) meeting hadn't happened and discovery hadn't kicked off.

She also recognized that they wanted to centralize, and they want to centralize in the Southern District of New York. So it doesn't make sense for them to jump the gun here if there is no longer an emergent situation.

There is no indication at all that maintaining these retains in our facility will cause any degradation between now and the time that the Judge can rule on them.

In fact, a danger is seeking over half of their remaining retains, including two-thirds of some samples, you know, a kilogram each, 2.2 pounds, really jeopardizes a claim of spoliation.

Also, in terms of this lab and representing that the FDA is relying on it, we disagree with that. Other

parties have said that they don't have a problem in theory with testing, but they want to make sure the lab and the specific laboratory site is certified for the specific test being given. They haven't provided us an indication of that. And we want to make sure that a right -- a proper protocol is entered into, and all the people at the table should have a voice in that.

And the Nevada Court said it would be premature for this Court to resolve discovery matters either before the Court handling the MDL or the Southern District of Texas set forth appropriate discovery parameters, particularly since there is a finite amount of product retains and the parties have different interests and needs, including the FDA.

The FDA has not said that they are done with testing. They are the ones driving the boat now. We don't want to be in a situation where we give them our retains and there isn't a sufficient amount for all the myriad of plaintiffs or the other defendants or the FDA who may want to do additional testing with or different testing with a different lab. That's all we are saying.

There is going to be this hearing, I think on March 26th or 28th; and then it's -- you know, they are asking that it move to the Judge in the Southern of District of Texas -- of New York who has most of these

cases.  There is just not a reason to jump the line and push this ahead of those other cases.

THE COURT:  Mr. Levin, help me out.  Where is the Mullane affidavit?  I've got to be frank.  I don't think I have read that.

MR. LEVIN:  I believe it was with our first filings.

Ms. Laird, do you have the ECF number in front of you?  Let me see if I can find it.

MS. LAIRD:  Let me pull that up.

THE COURT:  I know the exhibits to your first motion are A to Q.  So....

MR. LEVIN:  There is a declaration from Ms. Laird, and I believe the Mullane declaration -- oh, here.  I'm finding it.  It looks like it's Document 3, ECF 3 filed on January 30th on the Nevada docket.  Niall Mullane.

THE COURT:  No.  Exhibit C is --

MR. LEVIN:  I think it's a separate ECF, a separate -- it's not one of the exhibits.  I think it was filed as a unique document on the docket.

THE COURT:  Docket 3.  Okay.  Fair enough.  I thought I went through the exhibits.  Okay.

Anything else anyone wants to add?

(No response.)

*Laura Wells, RPR, RMR, CRR, RDR*

THE COURT: Okay. So here is my thought. I'm going to take this under advisement. I want to go read the Mullane affidavit, but I'll just be very frank. Upfront, I'm sort of hesitant to order discovery at this point in time unless there is some degradation that I am -- I'll see what the Mullane affidavit says. Otherwise, to me, it just makes more sense, as Mr. Oakley has pointed out, to wait until everyone is at the table to do this at one time before the Judge who will ultimately handle all this. The only concern I would have -- and I fully understand and appreciate Mr. Levin's desire for efficiency and speed. My only real concern would be, hey, is there a reason we have to do this now because, otherwise, there is going to be some sort of degradation or some sort of loss of samples or documents.

I say on the document side I'm really not that concerned simply because I know the documents are what they are and I have no reason to believe that they are going to be shredded or destroyed or anything like that.

And so let me take a look at the Mullane affidavit and let me give you --

MR. LEVIN: Yeah. And I will say, Your Honor, the Mullane affidavit was mostly about the testing but it -- you know, I think it will give you a sense of this.

Let me say one other thing, if I can, Your Honor,

which is --

THE COURT:  Sure.

MR. LEVIN:  -- I take Mr. Oakley's representation that they are all being -- the samples are all being retained.  I trust that they are.  I hope that they are.  But they haven't been willing to tell us anything about them, and they haven't put in any evidence.

And if we are going to put this off, you know, I would at least -- they should have to put in a declaration.  They should have to come in and someone with knowledge should have to say this is how we are storing them.  We are taking this seriously.  We are not just letting -- you know, it is not just lawyers talking about it.  Like, we're going to have somebody come in and actually explain this to someone.

Because, at this point, it really is -- it's a discovery dispute with just a lot of talking, you know, and people should have to put in some evidence and stand behind it if they are going to come in and say, you know, everyone should just hold and we shouldn't have to participate in discovery at this point.

So that would -- I ask Your Honor to consider that if you are going to go down the road of sort of tapping the brakes.  But we really appreciate your time.  Thank you.

THE COURT:  Understood.  Let me take a look

further at the documents.

Anything else, Mr. Oakley and Ms. Colton?

MR. OAKLEY:  No, Your Honor.

MS. COLTON:  No, Your Honor.

THE COURT:  Okay.  Well, hey, I really appreciate you-all making yourself available on such short notice, and we will hopefully get something out later today.  It might not be until early next week.  And once again, appreciate it and have a great weekend.  Be safe.  And as I always say at hearings on Fridays, everyone is ordered to take the rest of the day off.  So have a great one. See you later.  We're off the record.

ALL COUNSEL:  Thank you.

(Proceedings concluded at 9:24 a.m.)

*Date:  March 26, 2026*

### COURT REPORTER'S CERTIFICATE

*I, Laura Wells, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

_____/s/ Laura Wells_____

*Laura Wells, CRR, RMR*