William D. Marler, WSBA #17233
Marler Clark, Inc., P.S. (*pro hac vice*)
180 Olympic Drive S.E.
Bainbridge Island, Washington 98110
Tel: (206) 346-1888
Fax: (206) 346-1989
bmarler@marlerclark.com

QUIRK LAW FIRM, LLP
Trevor Quirk (SBN: 241626)
877 S Victoria Ave, Suite 111
Ventura, CA 93003
Tel: (805) 650-7778
Fax: (866) 728-7721
tmq@qlflaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ByHeart, Inc., Infant Formula Marketing, Sales Practices, and Products Liability Litigation | MDL Case No.: 1:26-md-03178 |
| This Document Applies to: | **THIRD AMENDED COMPLAINT** |
| 1:26-cv-02902 (AS) | **DEMAND FOR JURY TRIAL** |
| Anthony Barbera and Thalia Flores, individually and on behalf of A.B., a minor, | |
| Plaintiffs, | |
| v. | |
| ByHeart, Inc., a Delaware corporation; Target Corporation, a Minnesota corporation; and Dairy Farmers of America, Inc., a Kansas corporation, | |
| Defendants. | |

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

Page 1

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

COME NOW Plaintiffs Anthony Barbera and Thalia Flores, individually and on behalf of their minor child, A.B., who, by and through their attorneys, QUIRK LAW FIRM, LLP and MARLER CLARK, INC., P.S. (admitted *pro hac vice*), allege upon information and belief as follows:

## I. PARTIES

1.      Plaintiffs Anthony Barbera and Thalia Flores are adult residents of San Joaquin County, California. They are the parents and legal guardians of A.B., a minor, and bring this action individually and on A.B.'s behalf.

2.      Defendant ByHeart, Inc. ("ByHeart") is a for-profit corporation organized and existing under the laws of the State of Delaware. It conducts business throughout the United States, including in the State of California. Its principal place of business is located at 131 Varick Street, 11th Floor, New York, NY 10013. At all times relevant to this matter, ByHeart was the manufacturer, packager, distributor, marketer, and/or seller of the ByHeart Whole Nutrition Infant Formula that is the subject of this action.

3.      Defendant Target Corporation ("Target") is a publicly traded, for-profit corporation organized and existing under the laws of the State of Minnesota. It conducts business throughout the United States, including in the State of California, and operates retail stores in San Joaquin County, California. Two of its California retail locations are 10424 Trinity Parkway, Stockton, San Joaquin County, California 95219, and 2355 W. Kettleman Lane, Lodi, San Joaquin County, California 95242. Its principal place of business is located at 1000 Nicollet Mall, Minneapolis, MN 55403. At all times relevant to this matter, Target was the retail seller of the ByHeart Whole Nutrition Infant Formula that is the subject of this action.

---

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

Page 2

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

4.      Defendant Dairy Farmers of America, Inc. ("Dairy Farmers of America") is a for-profit corporation and global dairy cooperative organized and existing under the laws of the State of Kansas. It conducts business throughout the United States, including in the State of California. Its principal place of business is located at 1405 N. 98th Street, Kansas City, KS 66111. At all times relevant to this matter, Dairy Farmers of America processed fluid milk supplied by Organic West Milk, Inc. ("Organic West"), into the organic whole milk powder used as an ingredient in the subject infant formula, at a facility it owned and operated in Fallon, Nevada.

5.      At all relevant times, Defendants ByHeart, Target, and Dairy Farmers of America were engaged in the business of manufacturing, producing, processing, distributing, marketing, supplying, and/or selling the subject infant formula and/or its component ingredients that were contaminated with *Clostridium botulinum*.

6.      Plaintiffs are informed and believe, and thereon allege, that at all relevant times each Defendant was the agent, servant, employee, partner, joint venturer, and/or co-conspirator of each of the remaining Defendants, and in doing the things alleged herein was acting within the course and scope of that relationship and with the knowledge, permission, consent, and/or ratification of the remaining Defendants.

## II. JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Plaintiffs Anthony Barbera and Thalia Flores, and their minor child A.B., are citizens of the State of California. Defendant ByHeart, Inc. is incorporated under the laws of the State of Delaware and maintains its principal place of business in New York, New York, and is therefore a citizen of Delaware and New York. Defendant Target Corporation is incorporated under the

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

laws of the State of Minnesota and maintains its principal place of business in Minneapolis, Minnesota, and is therefore a citizen of Minnesota. Defendant Dairy Farmers of America, Inc. is incorporated under the laws of the State of Kansas and maintains its principal place of business in Kansas City, Kansas, and is therefore a citizen of Kansas.

8.    Venue was proper in the United States District Court for the Eastern District of California, the district in which this action was commenced, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in that district: Plaintiffs purchased the subject ByHeart infant formula at Target retail locations in Stockton and Lodi, San Joaquin County, California; A.B. consumed the contaminated formula and suffered his injuries in San Joaquin County; and A.B. was hospitalized and treated at St. Joseph's Medical Center in Stockton, San Joaquin County, California. Each Defendant is subject to personal jurisdiction in that district because each purposefully availed itself of the privilege of conducting business in the State of California and the claims alleged arise out of that conduct.

9.    This action is before this Court pursuant to the transfer order of the United States Judicial Panel on Multidistrict Litigation consolidating actions arising out of the ByHeart infant botulism outbreak for coordinated and consolidated pretrial proceedings in this District as *In re: ByHeart, Inc., Infant Formula Marketing, Sales Practices, and Products Liability Litigation*, MDL No. 3178. Pursuant to 28 U.S.C. § 1407(a), this action shall be remanded to the United States District Court for the Eastern District of California for trial upon the conclusion of coordinated pretrial proceedings. Plaintiffs' claims are governed by the substantive law of the State of California.

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL                    Page 4

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

### III.    GENERAL ALLEGATIONS

#### **What Is Infant Botulism and *Clostridium botulinum*?**

10.    *Clostridium botulinum* is an obligate anaerobic, spore-forming, Gram-positive bacillus whose primary, native habitat is the soil.[1] It thrives in low-oxygen environments and produces botulinum neurotoxin, one of the most lethal biological substances known. While the bacteria themselves are usually harmless, the toxin they create attacks the nervous system and causes botulism, a severe paralytic illness. There are several recognized forms of botulism:

•    *Foodborne*: Caused by eating foods contaminated with the toxin, often from improper home-canning or poorly preserved foods.

•    *Infant*: Occurs when babies (under one year old) ingest the bacterial spores, which then germinate and produce toxins in the gut. This is why honey should never be fed to infants.

•    *Wound*: Happens when *C. botulinum* spores infect a cut or wound and produce toxins, commonly associated with the use of contaminated injection drugs.

•    *Iatrogenic Botulism*: A rare type that occurs if too much botulinum toxin is injected for cosmetic purposes (like wrinkle reduction) or medical conditions (like migraines).

•    *Adult Intestinal Toxemia*: An extremely rare condition in older children and adults where spores colonize the intestinal tract and produce toxin (similar to infant botulism).

#### **Where Does *Clostridium botulinum* Come From?**

11.    Soil and Sediment: The Ultimate Natural Reservoir. Landmark environmental surveys dating back over a century have established that viable *C. botulinum* spores reside in ground soils, dust, and aquatic sediments across every continent where they have been sought. The distribution of specific toxin types in infant botulism cases typically reflects the geographic prevalence of those strains in the local soil. For example, in the United States, Type A spores are predominantly found in the western states, while Type B spores are more densely concentrated in the eastern and mid-Atlantic states.

---

[1] Jin, J. (2023). What is botulism? Journal of the American Medical Association (JAMA), 330(1), 90-90. https://jamanetwork.com/journals/jama/issue/330/1

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

12.     Airborne Dust and Environmental Displacement. Because spores are highly resistant to environmental stressors (such as drying, heat, and UV light), they easily become airborne. Presently, dust inhalation or ingestion is considered a primary, unavoidable exposure route.[2] Epidemiological data significantly associates infant botulism cases with residence in windy or dusty locations, as well as proximity to dust-generating activities.

13.     Honey: The Primary Identifiable and Avoidable Food Source. While environmental exposure is largely unpreventable, honey is universally recognized as the single most significant, avoidable foodborne vehicle for *C. botulinum* spores.[3] *C. botulinum* is not a disease of the honeybee. Instead, honey becomes an accidental repository when bees carry environmental dust, water, or pollen contaminated with spores back to the hive.[4] Because honey is typically consumed raw (unpasteurized and non-irradiated), and because bacterial spores are uniquely structurally adapted to survive low-moisture environments, the dormant spores remain viable inside the honey matrix indefinitely. Globally, about 4% of retail honey specimens test positive for *Clostridium botulinum* spores, though regional rates vary widely. While some localized surveys find no spores, others report contamination rates as high as 10% to 20% depending on the source and processing methods.[5]

---

[2] Dabritz, H. A., Chung, C. H., Read, J. S., & Khouri, J. M. (2025). Global occurrence of infant botulism: 2007-2021. Pediatrics, 155(4), e2024068791.

[3] Harris, R. A., & Dabritz, H. A. (2024). Infant botulism: in search of Clostridium botulinum spores. Current Microbiology, 81(10), 306. https://link.springer.com/article/10.1007/s00284-024-03828-0

[4] Schneider, K. R., Schneider, R. M. G., Kurdmongkoltham, P., & Bertoldi, B. (2025). Preventing foodborne illness: Clostridium botulinum. https://ask.ifas.ufl.edu/publication/FS104

[5] Harris, R. A., & Dabritz, H. A. (2024). Infant botulism: in search of Clostridium botulinum spores. Current Microbiology, 81(10), 306. https://link.springer.com/article/10.1007/s00284-024-03828-0

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

**Infant Botulism and *Clostridium botulinum***

14.    Infant botulism is a rare but serious paralytic illness of babies, usually affecting infants younger than one year. It is caused when an infant swallows spores of *Clostridium botulinum*, or rarely related toxin-producing *Clostridium* species, and those spores survive, germinate, and multiply in the immature intestine. The bacteria then produce botulinum neurotoxin inside the infant's gut. In plain terms, the baby does not simply ingest a "germ"; the infant's bowel becomes the place where the toxin is made.[6]

15.    That mechanism is what separates infant botulism from classic foodborne botulism. In foodborne botulism, a child or adult typically swallows toxin that has already formed in contaminated food. In infant botulism, the infant swallows spores, and the toxin is produced after the spores colonize the intestine. Infants are uniquely vulnerable because their gut microbiome, bile-acid profile, immune defenses, and intestinal motility are still developing, and they do not yet have the mature protective intestinal flora that usually prevent *C. botulinum* spores from gaining a foothold in older children and adults.[7] Approximately 95% of cases occur in infants under six months of age, with a median age of around three months. Most cases are caused by toxin type A or type B.[8] Because such spores are so widespread in the environment, in many individual cases the exact source is never identified.[9]

---

[6] CDC. Clinical Overview of Infant Botulism. April 24, 2024. https://www.cdc.gov/botulism/hcp/clinical-overview/infant-botulism.html

[7] CDC. Clinical Overview of Infant Botulism. April 24, 2024. https://www.cdc.gov/botulism/hcp/clinical-overview/infant-botulism.html; Rosow LK, Strober JB. Infant Botulism: Review and Clinical Update. Pediatr Neurol. 2015;52(5):487-492. https://pmc.ncbi.nlm.nih.gov/articles/PMC10332751/

[8] Dabritz et al., supra note 2; CDC, National Botulism Surveillance Summary, 2021, https://www.cdc.gov/botulism/php/national-botulism-surveillance/2021.html.

[9] Harris & Dabritz, supra note 3; American Family Physician (AAFP), Infant Botulism, https://www.aafp.org/pubs/afp/issues/2002/0401/p1388.html.

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

### Signs and Symptoms in Infants

16.    Infant botulism often begins subtly and then progresses over hours to days. Constipation is commonly one of the earliest signs, followed by poor feeding, weak suck, weak or altered cry, drooping eyelids, diminished facial expression, reduced gag reflex, poor head control, generalized hypotonia, lethargy, and respiratory difficulty. The CDC's clinical overview specifically lists constipation, poor feeding, ptosis, sluggish pupils, flattened facial expression, diminished suck and gag reflexes, weak or altered cry, and respiratory difficulty or arrest as typical findings.[10] Common signs include:

- Constipation, often for several days;
- Poor feeding, with weak sucking and swallowing;
- A weak, altered, or soft cry;
- Drooping eyelids (ptosis), sluggish pupils, and reduced eye movement;
- Generalized weakness and low muscle tone—the classic "floppy baby";
- Lethargy and a diminished gag reflex; and
- Breathing difficulty, progressing in severe cases to respiratory failure—the most dangerous complication.

17.    Because these early signs mimic more common conditions, a high index of suspicion matters. A baby with poor feeding, a weak cry, and increasing floppiness—especially with any breathing difficulty—needs urgent evaluation.[11]

### Botulism in Older Children and Adults

18.    The same toxin can cause serious illness in older children and adults, but the exposure pattern is different. Foodborne botulism occurs when a person eats food in which toxin has already formed, classically improperly canned, preserved, fermented, or stored low-acid foods. Wound botulism occurs when spores contaminate a wound and produce toxin in devitalized

---

[10] CDC. Clinical Overview of Infant Botulism. April 24, 2024. https://www.cdc.gov/botulism/hcp/clinical-overview/infant-botulism.html

[11] CDC, Clinical Overview of Infant Botulism, supra note 10; Jin, supra note 1.

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL                    Page 8

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

tissue; in modern U.S. practice, this is often associated with injection-drug use. Iatrogenic botulism can occur after excessive or improperly administered therapeutic or cosmetic botulinum toxin. Adult intestinal colonization botulism is rare but can occur when the adult gut is altered by surgery, antibiotics, bowel disease, or other disruptions.[12]

19.    In non-infant botulism, symptoms often begin with cranial nerve findings such as blurred or double vision, drooping eyelids, slurred speech, difficulty swallowing, dry mouth, and facial weakness. Weakness then typically descends symmetrically from the face and neck to the arms, trunk, and legs. Patients are usually awake and afebrile, and sensation is usually preserved, which can make the paralysis especially frightening. Severe cases require intubation and mechanical ventilation.

**Diagnosis and Laboratory Detection**

20.    Botulism is first and foremost a clinical diagnosis. Laboratory confirmation is important, but treatment should not wait for test results when the clinical picture is concerning. The CDC's 2021 clinical guidelines emphasize that timely diagnosis is crucial because antitoxin is the only specific therapy and should be administered as quickly as possible. Because the antitoxin works best when given early, clinicians treat as soon as infant botulism is reasonably suspected.[13]

21.    For infants, definitive testing usually requires stool or enema specimens, which can be tested for botulinum toxin and cultured for *C. botulinum*. Testing is specialized and is generally coordinated through state public health laboratories, the CDC, and the California

---

[12] Rao AK, Sobel J, Chatham-Stephens K, Luquez C. Clinical Guidelines for Diagnosis and Treatment of Botulism, 2021. MMWR Recomm Rep. 2021;70(2):1-30. https://www.cdc.gov/mmwr/volumes/70/rr/rr7002a1.htm; Jeffery IA, Nguyen AD, Karim S. Botulism. [Updated 2024 Nov 25]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2026 Jan. https://www.ncbi.nlm.nih.gov/books/NBK459273/

[13] Rao AK, Sobel J, Chatham-Stephens K, Luquez C. Clinical Guidelines for Diagnosis and Treatment of Botulism, 2021. MMWR Recomm Rep. 2021;70(2):1-30. https://www.cdc.gov/mmwr/volumes/70/rr/rr7002a1.htm

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Page 9

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

Department of Public Health Infant Botulism Treatment and Prevention Program. The CDC advises that this specialized testing often takes days and that clinicians should not delay BabyBIG treatment while awaiting confirmation.[14]

22.    In outbreak investigations, public health laboratories may also test leftover foods, unopened products, ingredients, environmental samples, and bacterial isolates from patients. Whole-genome sequencing can compare isolates from patients, products, and ingredients to determine whether they are genetically related. In the ByHeart outbreak, that genetic comparison was central because isolates from clinical samples, finished formula, base mix, and organic whole milk powder clustered together.[15]

### Treatment

23.    Infant botulism is highly treatable, and the great majority of babies recover fully. Care rests on two pillars: specific antitoxin and supportive care.[16] Treatment has two parts: neutralizing circulating toxin and supporting the patient while nerves recover. For infants, the specific treatment is human botulism immune globulin intravenous, known as BIG-IV or BabyBIG. BabyBIG is FDA-approved for infant botulism types A and B and is obtained in the United States through the Infant Botulism Treatment and Prevention Program. The treating physician contacts the program for immediate consultation; if the presentation supports infant

---

[14] CDC. Clinical Overview of Infant Botulism. April 24, 2024. https://www.cdc.gov/botulism/hcp/clinical-overview/infant-botulism.html

[15] CDC. Investigation Update: Infant Botulism Outbreak, November 2025. March 4, 2026. https://www.cdc.gov/botulism/outbreaks-investigations/infant-formula-nov-2025/investigation.html; FDA. Outbreak Investigation of Infant Botulism: Infant Formula (November 2025). Content current as of June 3, 2026. https://www.fda.gov/food/outbreaks-foodborne-illness/outbreak-investigation-infant-botulism-infant-formula-november-2025

[16] Jeffery IA, Nguyen AD, Karim S. Botulism. [Updated 2024 Nov 25]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2026 Jan-. https://www.ncbi.nlm.nih.gov/books/NBK459273/

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

botulism, BabyBIG is released and treatment begins without waiting for final laboratory confirmation.[17]

24.    The evidence for BabyBIG is strong. In a randomized, double-blind, placebo-controlled California trial of 122 infants with laboratory-confirmed infant botulism, treatment within three days of hospital admission reduced mean hospital stay from 5.7 weeks to 2.6 weeks. It also reduced ICU time, mechanical ventilation time, tube or intravenous feeding time, and hospital charges. In plain language, BabyBIG does not instantly make the baby well, but it stops additional circulating toxin from binding and can substantially shorten the illness.[18]

25.    Supportive care is equally important. Infants may need close ICU monitoring, respiratory support, mechanical ventilation, suctioning, prevention of aspiration, nutritional support through nasogastric or other tube feeding, bowel care, occupational therapy, feeding therapy, physical therapy, and careful discharge planning. Antibiotics are generally not used to treat infant botulism itself because bacterial killing in the gut may increase toxin release; aminoglycosides and certain other medications that impair neuromuscular transmission are avoided because they can worsen weakness.[19]

26.    For older children and adults with suspected foodborne, wound, or other non-infant botulism, the specific antitoxin is generally heptavalent botulinum antitoxin, obtained through public health authorities and the CDC. As with infants, antitoxin should be given as early

---

[17] CDC. Clinical Overview of Infant Botulism. April 24, 2024. https://www.cdc.gov/botulism/hcp/clinical-overview/infant-botulism.html; Scarborough, A. P., Khouri, J. M., Chung, C. H., Dabritz, H. A., & Read, J. S. (2025). International Experience with Human Botulism Immune Globulin for the Treatment of Infant Botulism. Medical Research Archives, 13(10). https://esmed.org/MRA/mra/article/view/7026

[18] Scarborough, A. P., Khouri, J. M., Chung, C. H., Dabritz, H. A., & Read, J. S. (2025). International Experience with Human Botulism Immune Globulin for the Treatment of Infant Botulism. Medical Research Archives, 13(10). https://esmed.org/MRA/mra/article/view/7026

[19] Rao AK, Sobel J, Chatham-Stephens K, Luquez C. Clinical Guidelines for Diagnosis and Treatment of Botulism, 2021. MMWR Recomm Rep. 2021;70(2):1-30. https://www.cdc.gov/mmwr/volumes/70/rr/rr7002a1.htm

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

as possible, because it neutralizes toxin that has not yet bound to nerves. Wound botulism also requires wound evaluation and debridement, and antibiotics may be used for wound infection after antitoxin decisions are addressed.[20]

## Prognosis, Recovery, and Complications

27.    With prompt recognition, BabyBIG, and modern intensive care, most infants survive and recover. That favorable long-term prognosis, however, should not obscure the severity of the acute illness, which is frightening, often protracted, and frequently requires weeks of intensive hospital care. The recognized complications include:

•    Respiratory failure, apnea, and aspiration—the principal reason a ventilator may be required (on average roughly three weeks when needed);

•    Prolonged feeding difficulty—safe oral feeding can take many weeks to return;

•    Autonomic effects such as urinary retention, and secondary infections (e.g., pneumonia, ear infection) acquired in the hospital; and

•    Prolonged general weakness during recovery.[212223]

28.    A baby with infant botulism may spend days to weeks unable to feed safely, protect the airway, or breathe without support. Families may experience a prolonged hospitalization, transfer to a tertiary children's hospital, repeated testing, feeding-tube dependence, ventilator care, and months of follow-up.[24] In the 2025 ByHeart-formula outbreak,

[20] Jeffery IA, Nguyen AD, Karim S. Botulism. [Updated 2024 Nov 25]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2026 Jan-. https://www.ncbi.nlm.nih.gov/books/NBK459273/; Scarborough, A. P., Khouri, J. M., Chung, C. H., Dabritz, H. A., & Read, J. S. (2025). International Experience with Human Botulism Immune Globulin for the Treatment of Infant Botulism. Medical Research Archives, 13(10). https://esmed.org/MRA/mra/article/view/7026.

[21] Scarborough, A. P., Khouri, J. M., Chung, C. H., Dabritz, H. A., & Read, J. S. (2025). International Experience with Human Botulism Immune Globulin for the Treatment of Infant Botulism. Medical Research Archives, 13(10). https://esmed.org/MRA/mra/article/view/7026

[22] Morris, V., Wians, R., Wilson, J., & Stevens, G. (2022). Infant Botulism. Journal of Education & Teaching in Emergency Medicine, 7(2), S48. https://pmc.ncbi.nlm.nih.gov/articles/PMC10332751/

[23] Rosow & Strober, supra note 7.

[24] Scarborough, A. P., Khouri, J. M., Chung, C. H., Dabritz, H. A., & Read, J. S. (2025). International Experience with Human Botulism Immune Globulin for the Treatment of Infant Botulism. Medical Research Archives, 13(10). https://esmed.org/MRA/mra/article/view/7026

THIRD AMENDED COMPLAINT AND                      Page 12
DEMAND FOR JURY TRIAL

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

CDC preliminary data found that approximately two-thirds of evaluated infants required post-hospitalization physical therapy or feeding support.[25] Reasonable follow-up commonly includes primary care, neurology as needed, feeding or speech therapy, physical and occupational therapy, nutrition monitoring, developmental surveillance, and assessment for residual weakness, dysphagia, oral aversion, motor delay, or caregiver trauma. Lasting neurological after-effects are seldom seen, and most infants regain normal strength and development; severe long-term harm is rare. Follow-up with neurology and physiotherapy is advisable after a severe episode.[26]

## The ByHeart Infant Formula Outbreak

29.    Infant botulism is normally sporadic; most cases involve one infant, one household, and no single identified commercial source. Bacterial spores are widely present in soil and dust around the country and therefore may cause sporadic, random infections. A multistate outbreak of infant botulism tied to a manufactured infant formula is therefore unusual. The Centers for Disease Control and Prevention (CDC) and the U.S. Food and Drug Administration (FDA) concluded that epidemiologic and laboratory evidence showed ByHeart Whole Nutrition infant formula was contaminated with *C. botulinum* and made infants sick. Outbreaks like this have, historically, been uncommon.[27] According to the FDA, this is the first known botulism outbreak tied to infant formula anywhere in the world since the condition was first described about fifty years ago.[28]

---

[25] CDC EIS Conference. Severity of Illness and Clinical Outcomes of Infants Linked to an Infant Botulism Outbreak Caused by Powdered Infant Formula - United States, 2025. April 17, 2026. https://www.cdc.gov/eis-conference/php/abstracts/infant-botulism-outbreak-caused-by-powdered-infant-formula.html

[26] AAFP, supra note 9; Rosow & Strober, supra note 7; Botulism Sequelae: A Systematic Review, PMC, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC12798721/.

[27] Harris, R. A., & Dabritz, H. A. (2024). Infant botulism: in search of Clostridium botulinum spores. Current Microbiology, 81(10), 306. https://link.springer.com/article/10.1007/s00284-024-03828-0

[28] U.S. FDA, Outbreak Investigation of Infant Botulism: Infant Formula (November 2025), https://www.fda.gov/food/outbreaks-foodborne-illness/outbreak-investigation-infant-botulism-infant-formula-november-2025; Contemporary Pediatrics, Infant botulism outbreak linked to powdered formula under FDA

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL                    Page 13

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

30.     In October 2025, California's Infant Botulism Treatment and Prevention Program noticed that three infants with suspected infant botulism had all been fed the same powdered formula. State officials alerted the CDC, and a multistate investigation followed. The case total was revised as the investigation widened, the case definition was expanded to capture earlier illnesses, and some early-suspected cases were later reclassified.[29]

31.     The FDA and CDC—in collaboration with the California Department of Public Health (CDPH), the Infant Botulism Treatment and Prevention Program (IBTPP), and other state and local partners—investigated the multistate infant botulism outbreak and concluded that ByHeart Whole Nutrition infant formula was its source. On February 26, 2026, the CDC declared the outbreak over.

32.     Public health officials reviewed the medical records of the 51 infants initially included in the investigation and applied additional case-definition criteria; no new cases have been added since December 10, 2025, and three previously reported cases from three states were ultimately diagnosed with other illnesses and excluded. The final case count is 28 confirmed and 20 probable cases of infant botulism—48 in all—with all 48 infants hospitalized, no deaths reported, and the last known illness onset on November 29, 2025.[30]

investigation, https://www.contemporarypediatrics.com/view/infant-botulism-outbreak-linked-to-powdered-formula-under-fda-investigation

[29] Khouri JM, et al., Multistate Infant Botulism Outbreak Associated with Powdered Infant Formula, NEJM Evidence (2026), https://evidence.nejm.org/doi/full/10.1056/EVIDpha2600020; CDC, Investigation Update: Infant Botulism Outbreak, November 2025 (final case data, Mar. 4, 2026), https://www.cdc.gov/botulism/outbreaks-investigations/infant-formula-nov-2025/investigation.html

[30] CDC, Outbreak of Infant Botulism Linked to ByHeart Infant Formula - Food Safety Alert and Investigation Update (outbreak declared over Feb. 26, 2026), https://www.cdc.gov/botulism/outbreaks-investigations/infant-formula-nov-2025/index.html; U.S. FDA, FDA's Actions to Respond to Clostridium botulinum Illnesses Associated with Consumption of Powdered Infant Formula (Feb. 26, 2026 update), https://www.fda.gov/food/outbreaks-foodborne-illness/fdas-actions-respond-clostridium-botulinum-illnesses-associated-consumption-powdered-infant-formula; FDA, Whole Genome Sequencing (WGS) Program, https://www.fda.gov/food/microbiology-research-food/whole-genome-sequencing-wgs-program.

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

33.      Cases were reported across seventeen states: Arizona, California, Idaho, Illinois, Kentucky, Massachusetts, Michigan, Minnesota, North Carolina, New Jersey, Oregon, Pennsylvania, Rhode Island, Texas, Virginia, Washington, and Wisconsin.[31]



*Figure 1: CDC case map — 48 confirmed and probable infant botulism cases across 17 states.*



*Figure 2: CDC epidemic curve — illness onsets by month, December 2023–November 2025.*

34.      Whole-genome sequencing tied patients, finished product, and ingredients together to the outbreak. As of February 26, 2026, two isolates from one lot of organic, whole-

---

[31] CDC and U.S. FDA, supra notes 15 and 28.

THIRD AMENDED COMPLAINT AND          Page 15
DEMAND FOR JURY TRIAL

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

milk powder—collected by the FDA at Dairy Farmers of America, the processor for Organic West, which supplied ByHeart—matched a cluster of clinical and food isolates that the FDA had first reported on January 23, 2026. That cluster also included an unopened powdered-formula sample tested by ByHeart; a closed, powdered-formula sample tested by the New York State Department of Health, Wadsworth Laboratory; one clinical isolate; and three isolates from one lot of organic, whole-milk powder tested by ByHeart.[32]

35.    Additional clinical isolates analyzed by CDPH matched clusters including product samples. One clinical isolate matched a cluster that now includes three clinical isolates and an opened powdered-formula sample (tested by CDPH and reported positive on November 18, 2025). A second clinical isolate matched a cluster that now includes one clinical isolate, four isolates from one lot of powdered formula tested by ByHeart, and one sample of the base mix, used to make the powdered formula, tested by ByHeart.[33]

36.    The FDA has cautioned that testing for *C. botulinum* in infant formula and its ingredients is complex. To date, WGS has identified 17 different strains of the bacterium across patient, finished-product, and ingredient samples. While those results add to the evidence needed to investigate the outbreak's origin, the FDA stated that, given the complexities of *C. botulinum* and the limited scientific evidence currently available, it has not yet determined a root cause of contamination, and that additional analysis and research are necessary. The agency has transitioned from its initial emergency response to post-incident surveillance, prevention, and compliance activities while continuing to investigate the root cause.[34]

---

[32] U.S. FDA, supra note 28.

[33] U.S. FDA and California Dept. of Public Health, supra note 28.

[34] U.S. FDA, supra note 28.

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

### The Source

37.    Milk and milk powder is the suspected root cause. Investigators detected *C. botulinum* type A in finished ByHeart formula, and the New York State Wadsworth Center reported that WGS of an isolate from a sample of the organic, whole-milk powder—collected at a processor supplying ByHeart—matched the strain from the finished formula and from a sick infant. Contaminated milk powder used as an ingredient is the leading explanation for how the pathogen contaminated the product, even though, as noted above, the FDA has not formally declared a single root cause as of its February 26, 2026 update. The full source investigation remains ongoing.[35]

*The 2025 ByHeart outbreak is summarized in the table below.*[36]

| Feature | Summary |
|---|---|
| Product | ByHeart Whole Nutrition powdered infant formula (cans and single-serve "Anywhere Pack"); on sale nationwide since March 2022 |
| Case Count (final) | 48 infants — 28 confirmed and 20 probable. Reduced from an interim 51 infants after record review applied additional case-definition criteria and three cases from three states were diagnosed with other illnesses and excluded (review completed Feb. 26, 2026) |
| Locations (17 states) | AZ, CA, ID, IL, KY, MA, MI, MN, NC, NJ, OR, PA, RI, TX, VA, WA, WI |
| Outcomes | All 48 infants hospitalized and treated with BabyBIG; no deaths reported |
| Illness Onset | December 24, 2023 – November 29, 2025 (most clustered August–November 2025) |
| Investigation Status | CDC declared the outbreak over on February 26, 2026; no new cases added since December 10, 2025 |
| Toxin Type | Both toxin type A and type B recovered from outbreak cases. The formula / milk-powder strain and its genetically-matched cases were |

[35] U.S. FDA, supra note 28; New York State Dept. of Health, Wadsworth Center, supra note 30.

[36] U.S. FDA, supra note 28; CDC, supra note 15; Khouri JM, et al., supra note 29; New York State Dept. of Health, Wadsworth Center, Biodefense Laboratory Identifies Contamination Source in Multistate Infant Botulism Outbreak (2026), https://www.wadsworth.org/news/wadsworth-center-biodefense-laboratory-identifies-contamination-source-multistate-infant.

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

| Feature | Summary |
|---|---|
|  | type A (subtype A1); the unusual appearance of a type A strain in locations where type B strains normally dominate was a key outbreak signal |
| Laboratory Evidence | C. botulinum detected in infant formula (multiple lots), in opened and closed formula samples, in the base mix, and in the organic, whole-milk powder ingredient; whole-genome sequencing (WGS) has identified 17 distinct strains across patient, product, and ingredient samples |
| Source | Whole-genome sequencing links the outbreak pathogen across clinical, formula, base-mix, and ingredient samples, with strong matches to organic, whole-milk powder supplied to ByHeart; as of Feb. 26, 2026, the FDA had not yet determined a single root cause and the investigation continues |
| Recall | Two lots of formula were recalled on Nov. 8, 2025; all ByHeart products were recalled on Nov. 11, 2025 |
| Significance | Per the FDA, this is the first identified botulism outbreak tied to infant formula since infant botulism was first described ~50 years ago |

38.     Because spores can be unevenly distributed through a batch of powder, not every infant who consumed the contaminated formula became ill. All infants were nonetheless considered at risk, which is why every ByHeart product was recalled and parents were urged to stop using it and to discard it.[37]

## Why Formula Was Vulnerable Here

39.     Powdered infant formula is not sterile. The pathogens usually watched for (such as *Cronobacter* and *Salmonella*) do not form spores and are killed by pasteurization. Spore-forming bacteria, like *C. botulinum*, are different: their heat-resistant spores can survive normal processing. The 2025 event prompted the FDA and international food-standards bodies to begin a formal risk assessment of spore-forming organisms in powdered infant formula.[38]

---

[37] CDC, supra note 15; U.S. FDA, supra note 28.

[38] U.S. FDA, FDA's Actions to Respond to Clostridium botulinum Illnesses Associated with Consumption of Powdered Infant Formula, https://www.fda.gov/food/outbreaks-foodborne-illness/fdas-actions-respond-

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

40.     The literature establishes both the historical rarity of *C. botulinum* in commercial dried milk and formula, and the singular significance of the ByHeart outbreak:

• Until 2025, *C. botulinum* was essentially never found in commercial dried milk or formula. Dedicated surveys—including nonfat dry milk, evaporated milk, and canned formula—historically tested negative.[39]

• The 2025 ByHeart outbreak is the turning point and the strongest evidence of milk-powder risk to date. Whole-genome sequencing tied type A *C. botulinum* in organic, whole-milk powder to the strain in finished formula and to the strain in sick infants across multiple states—a tight genetic match across ingredient, product, and patient.[40][41]

• Earlier formula links were single cases with caveats. A 2001 United Kingdom case and a 2023 Chinese investigation each recovered the organism from formula milk powder, but causation was never firmly proven.[42]

• Fluid and raw milk can carry the organism and toxin in the case of bovine botulism, and these spores also survive pasteurization, although pasteurization strongly degrades pre-formed toxin.[43]

41.     Related findings in soft, high-moisture dairy products, such as Italian mascarpone cheese, and in raw milk during herd botulism confirm that *C. botulinum* can and does contaminate

---

clostridium-botulinum-illnesses-associated-consumption-powdered-infant-formula; Contemporary Pediatrics, supra note 28.

[39] Guilfoyle DE, Yager JF, Survey of infant foods for Clostridium botulinum spores, 66 J. Assoc. Off. Anal. Chem. 1302 (1983), https://pubmed.ncbi.nlm.nih.gov/6355058/; Barash JR, et al., Clostridial spores in powdered infant formula, J. Pediatr. (2010), https://www.jpeds.com/article/S0022-3476(10)00070-3/fulltext.

[40] U.S. FDA, supra note 28; Harris RA, et al., Detection and characterization of Clostridium botulinum isolated from powdered infant formula, Front. Microbiol. (2026), https://www.frontiersin.org/journals/microbiology/articles/10.3389/fmicb.2026.1800624/abstract.

[41] Harris, R. A., & Dabritz, H. A. (2024). Infant botulism: in search of Clostridium botulinum spores. Current Microbiology, 81(10), 306. https://link.springer.com/article/10.1007/s00284-024-03828-0

[42] Brett MM, et al., A case of infant botulism with a possible link to infant formula milk powder, J. Med. Microbiol. (2005), https://pubmed.ncbi.nlm.nih.gov/16014431/; Johnson EA, et al., Characterization of Clostridium botulinum Strains Associated with an Infant Botulism Case in the United Kingdom, 43 J. Clin. Microbiol. 2602 (2005), https://pmc.ncbi.nlm.nih.gov/articles/PMC1151885; Luo H, et al., Isolation and typing of Clostridium botulinum from milk powder of an enterprise associated with a case of infant botulism, 35 Chinese J. Food Hygiene 1475 (2023), https://doaj.org/article/30d4cb5e20434fad9a47a75d7afcd132.

[43] Bohnel H, et al., Presence of Clostridium botulinum and botulinum toxin in milk and udder tissue of dairy cows with suspected botulism, Vet. Rec. (2013), https://pubmed.ncbi.nlm.nih.gov/23585115/; Lindstrom M, et al., Clostridium botulinum in cattle and dairy products, 50 Crit. Rev. Food Sci. Nutr. 281 (2010), https://pubmed.ncbi.nlm.nih.gov/20301016/; The Case of Botulinum Toxin in Milk: Experimental Data, 76 Appl. Environ. Microbiol. 3293 (2010), https://aem.asm.org/content/76/10/3293.full.

---

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

Page 19

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

a dairy matrix when conditions allow.[44] The studies significant to the link between botulism and milk / formula, beyond the current outbreak, are summarized below:

| Source | What was tested | Key finding |
|---|---|---|
| Harris et al., Front. Microbiol., 2026 (USA) | Unopened formula containers and bulk "base powder" (formula before packaging) | C. botulinum found in both finished product and base powder, even where the usual indicator organism was non-detectable, so standard screening would have missed it. |
| Brett et al., J. Med. Microbiol., 2005 (UK, 2001 case) | 14 home foods from a 5-month-old with infant botulism | Type B C. botulinum recovered from an opened can of infant formula milk powder; two product isolates WGS-matched the infant's isolate. The link was never definitively proven. |
| Luo et al., Chinese J. Food Hygiene, 2023 (China) | 30 batches of infant formula milk powder from a company tied to a botulism case | While the toxin was not detected directly, C. botulinum (type B) was isolated from one batch of milk powder. |
| Barash et al., J. Pediatr., 2010 (USA) | 30 patient-used formula samples and nine market-bought formulas | Clostridium spores in 17% of patient-used and 78% of market formulas—but none were C. botulinum (they were related Clostridium species). |

*Full citations for the studies above appear at notes 45–48, infra.*[45]

42.    In short, across decades of surveys, the detection of *C. botulinum* in commercial dried milk or formula was possible but vanishingly rare until 2025. That consistently rare baseline is precisely what makes the widespread genetic evidence in this outbreak—milk powder to finished formula and base mix to sick infants—so indicative of the formula's defective and adulterated condition, notwithstanding that the FDA has not yet announced the formal root cause.

---

[44] Franciosa G, et al., Clostridium botulinum spores and toxin in mascarpone cheese and other milk products, 62 J. Food Prot. 867 (1999), https://pubmed.ncbi.nlm.nih.gov/10456738/; Aureli P, et al., An outbreak in Italy of botulism associated with a dessert made with mascarpone cream cheese, 16 Eur. J. Epidemiol. 913 (2000), https://pubmed.ncbi.nlm.nih.gov/11338122/.

[45] Harris RA, et al., supra note 40 (C. botulinum present in finished product and bulk "base powder," with genetic identity between a finished lot and a base powder, and detectable even where the usual indicator organism, sulfite-reducing clostridia, was non-detectable — such that standard screening would have missed it).

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

**Post-Outbreak Developments**

43.     Developments after the outbreak was declared over have reinforced that ByHeart's formula was the vehicle of contamination and that a contaminated dairy ingredient was the likely source. The FDA completed its onsite inspections of ByHeart's manufacturing facilities and reported that it did not identify any facility deficiency that could explain the root cause of the outbreak; the agency's continuing root-cause investigation is instead focused on incoming ingredients, and in particular on the dairy supply chain.

44.     The FDA and ByHeart sampled dairy ingredients at Dairy Farmers of America—the processor for ByHeart's supplier, Organic West—and whole-genome sequencing showed that two isolates from a single lot of organic, whole-milk powder matched a clinical isolate and a finished-formula sample isolate. The absence of any facility-based explanation, coupled with the genetic linkage running from the milk-powder ingredient to the finished product to sick infants, points squarely to a contaminated dairy ingredient.[46]

45.     Significantly, in June 2026, the FDA and CDC opened a second multistate infant-botulism investigation. This one was linked to a different brand, Nara Organics Whole Milk Organic powdered infant formula, and involved four confirmed *C. botulinum* type A infections from California, Pennsylvania, and Washington, with illness onsets in April and May 2026. Laboratory testing has since confirmed *Clostridium botulinum* in an open can of Nara Organics formula that had been fed to one of the sick infants, and the FDA is testing an unopened can from

---

[46] U.S. FDA, Post-Outbreak Response Activities: Clostridium botulinum Illnesses Associated with Consumption of Powdered Infant Formula (onsite inspections of ByHeart facilities concluded; no facility deficiency identified that could explain the root cause; ongoing root-cause investigation focused on incoming ingredients and the dairy supply chain; WGS match between two isolates from one lot of organic whole milk powder sampled at Dairy Farmers of America and a clinical isolate and a positive finished-formula sample), https://www.fda.gov/food/outbreaks-foodborne-illness/post-outbreak-response-activities-clostridium-botulinum-illnesses-associated-consumption-powdered; see also After Infant Botulism Outbreak, FDA Shares Root Cause Analysis Findings from ByHeart Formula Plants, Food Safety Magazine (June 10, 2026).

THIRD AMENDED COMPLAINT AND                    Page 21
DEMAND FOR JURY TRIAL

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

the same lot. There is a further, troubling connection between the two brands. When ByHeart recalled its formula in November 2025, it did not simply direct affected families to generic alternatives; it affirmatively steered them to Nara Organics. In a November 11, 2025 Instagram post, ByHeart recommended Nara Organics products and offered ByHeart customers a 20% discount code "to help and support ByHeart families make a smooth transition to a new formula." That post was later deleted. ByHeart has since maintained that the two companies are entirely separate and that it merely shared a discount code as a resource; but the practical effect was that families fleeing one botulism-linked formula were pointed toward a second formula drawing on the very same organic-whole-milk supply chain—a chain that would, months later, be tied to a second infant-botulism outbreak.[47]

46.    Nara Organics and ByHeart share the same dairy suppliers: Organic West and its processor, Dairy Farmers of America. That two separate infant formula brands drawing from the same organic-whole-milk supply chain each became associated with type A infant botulism is powerful corroboration that the dairy ingredient—not some idiosyncratic feature of one manufacturer's plant—is the common thread, and it strengthens the inference of source in the recent infant botulism outbreaks.[48]

---

[47] See Alison Young, ByHeart recommended its customers switch to Nara. Now a second infant formula is linked to botulism, Healthbeat (June 15, 2026), https://www.healthbeat.org/2026/06/15/nara-baby-formula-recall-botulism-cases-raise-safety-oversight-questions/ (ByHeart encouraged customers to switch to Nara Organics; a Nov. 11, 2025 ByHeart Instagram post recommending Nara products and offering a 20% discount code was deleted after the connection was reported); For Second Time in 7 Months, Baby Formula Linked to Infant Botulism Is Recalled, Truthout (June 2026) (ByHeart statement that the companies are "completely separate" and that it "shared a Nara discount code as a resource to help its customers find alternative options quickly"); see also New infant botulism outbreak puts fancy formulas under scrutiny, STAT (June 18, 2026) (noting ByHeart "directed customers to Nara during its recall last year, with Nara offering a 20% discount").

[48] U.S. FDA, Outbreak Investigation of Infant Botulism: Powdered Infant Formula (June 2026) (initially three confirmed type A infant-botulism cases in California, Pennsylvania, and Washington linked to Nara Organics Whole Milk Organic powdered infant formula, onsets April-May 2026; Organic West Milk and its processor, Dairy Farmers of America, identified as suppliers shared with ByHeart; Organic West Milk's earlier customer list to FDA was incomplete and omitted Nara Organics), https://www.fda.gov/food/outbreaks-foodborne-illness/outbreak-investigation-infant-botulism-powdered-infant-formula-june-2026; see also New infant botulism outbreak puts fancy formulas under scrutiny, STAT (June 18, 2026). The CDC's investigation update, last revised July 6, 2026,

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

47.     These events also underscore the outbreak's gravity. The 2025 ByHeart event is the largest infant-botulism outbreak ever documented in the United States and the first botulism outbreak tied to infant formula anywhere in the world, and it has prompted an international response: at the FDA's urging, the Codex Committee on Food Hygiene and the joint FAO/WHO expert body (JEMRA) undertook a formal risk assessment of spore-forming pathogens, including *C. botulinum*, in powdered infant formula. ByHeart, for its part, has stated that it will not resume production without a new *C. botulinum*-specific testing protocol applied to every dairy ingredient and every finished batch before release—an implicit acknowledgment that the controls in place during the outbreak could not detect the hazard.[49]

## The Defendants' Dairy Supply Chain

48.     The whole milk powder sample collected by the FDA that tested positive for *Clostridium botulinum* type A was made from whole milk supplied by Organic West.

49.     Organic West transported whole milk to Defendant Dairy Farmers of America for processing into whole milk powder at a facility owned and operated by Dairy Farmers of America in Fallon, Nevada.

50.     Following the processing of whole milk into whole milk powder, Dairy Farmers of America delivered, shipped, and/or sold the whole milk powder back to Organic West, which subsequently distributed and/or sold it to ByHeart for use as an ingredient in ByHeart's powdered

reports four confirmed type A cases (California (2), Pennsylvania (1), and Washington (1)), all hospitalized and treated with BabyBIG, and states that laboratory testing detected Clostridium botulinum in an open can of Nara Organics formula fed to one of the infants, with the FDA testing an unopened can from the same lot. CDC, Investigation Update on Infant Botulism Outbreak, June 2026 (last updated July 6, 2026), https://www.cdc.gov/botulism/outbreaks-investigations/infant-formula-june-2026/investigation.html.

[49] Khouri JM, et al., Multistate Infant Botulism Outbreak Associated with Powdered Infant Formula, NEJM Evidence (2026); Codex Committee on Food Hygiene / FAO-WHO Joint Expert Meetings on Microbiological Risk Assessment (JEMRA) risk assessment of spore-forming pathogens, including C. botulinum, in powdered infant formula (undertaken at FDA's urging); ByHeart, Inc., public statements regarding its post-outbreak Action Plan (new C. botulinum-specific testing protocol applied to every dairy ingredient and finished batch prior to release).

THIRD AMENDED COMPLAINT AND                         Page 23
DEMAND FOR JURY TRIAL

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

infant formula. In processing fluid milk into whole milk powder, Dairy Farmers of America manufactured, produced, and supplied a component part of the subject infant formula, and is therefore subject to strict liability as a manufacturer of that component part. The whole milk powder was defective and adulterated with *Clostridium botulinum* when it left the control of Dairy Farmers of America, and was not rendered defective by any subsequent processing, handling, blending, or formulation performed by Organic West or ByHeart.

51.    Organic West has halted the sale of the whole milk powder used in any product intended for babies and children.

### ByHeart's Regulatory History

52.    ByHeart, Inc. is the parent company for three manufacturing and packaging facilities:

- Blendhouse LLC (Reading, PA), a manufacturing site;
- Blendhouse Allerton, LLC (Allerton, IA), a manufacturing site; and
- Blendhouse Portland LLC (Portland, OR), a packaging site.

53.    Of these, the Reading facility manufactures the infant formula base product, which is then blended and packaged at a different facility.

54.    The Reading location achieved its FDA registration on April 28, 2022 and was subjected to an initial, and successful, FDA inspection in June 2022.

55.    Two subsequent FDA inspections, however, found multiple problems. When child illnesses were linked to *Cronobacter sakazakii* and infant formula in 2022, the FDA chose to take an in-depth look at all the powdered infant formula manufacturing sites, including ByHeart's Reading facility. What they found was disturbing, resulting in two inspections—one in February 2023 and another in January 2024—being classified as "Official Action Indicated."

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL                Page 24

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

*Inspection — End Date February 17, 2023*

56.    The FDA investigation team uncovered numerous problems, which were summarized in a Warning Letter dated August 30, 2023. These included:

•    Lack of process control system, as evidenced by a finding of *Cronobacter sakazakii* in a batch of ByHeart Whole Nutrition Infant Formula finished product. The infant formula base incorporated into that batch had been manufactured in continuous process from July 13, 2022, through August 23, 2022;

•    A discrepancy between the company's root-cause analysis of the *Cronobacter* contamination problem and the conclusion of the third-party lab, in which the company blamed lab error and the lab denied that it had erred;

•    Multiple notifications from a third-party lab of positive *Cronobacter sakazakii* findings from July 25, 2022 through August 27, 2022 within the processing environment; and

•    Two water events, during which water leaked into the manufacturing areas from outside.

*Inspection — End Date January 19, 2024*

57.    The FDA conducted its next inspection eleven months later. According to information posted on the FDA's inspection data dashboard, investigators uncovered several serious problems. ByHeart:

•    did not implement a system of production and in-process controls for an infant formula;

•    did not maintain a building used in the manufacture, processing, packing, or holding of infant formula in a clean and sanitary condition;

•    did not minimize the potential for contamination of raw materials using appropriate measures;

•    did not ensure that all surfaces that contacted ingredients, in-process materials, and infant formula were cleaned and sanitized and maintained to protect infant formula from being contaminated by any source;

•    did not monitor the temperature in thermal processing equipment at a point where temperature control is necessary to prevent adulteration; and

•    did not exclude pests from its food plant to protect against contamination of food.

## Product Sampling and Testing

58.    As part of this investigation, product sampling and testing was conducted by the FDA, the CDC, state partners, and ByHeart. On December 3, 2025, six samples of ByHeart infant

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

Page 25

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

formula tested positive for *Clostridium botulinum*. These six samples were taken from two batches (Batch 251261P2 and Batch 251131P2), both of which were included in the initial product recall (ByHeart did not report the specific batch corresponding to each of its individual samples).

| Sample Collected / Analyzed by | Product | Test Result | Toxin Type |
|---|---|---|---|
| CDPH | Opened container of ByHeart Infant Formula (Batch No. 251131P2) | Positive | Type A |
| ByHeart | ByHeart Infant Formula (Batch/Batches Not Reported) | Positive | Type A |
| ByHeart | ByHeart Infant Formula (Batch/Batches Not Reported) | Positive | Type A |
| ByHeart | ByHeart Infant Formula (Batch/Batches Not Reported) | Positive | Type A |
| ByHeart | ByHeart Infant Formula (Batch/Batches Not Reported) | Positive | Type A |
| ByHeart | ByHeart Infant Formula (Batch/Batches Not Reported) | Positive | Type A |

59.     Recalled products were also sold through online marketplaces and shipped to customers outside the United States. Customer information provided by Amazon shows that a limited quantity of recalled ByHeart infant formula was distributed to Argentina, Brazil, Brunei, Canada, Chile, China, Colombia, Ecuador, Egypt, Hong Kong, Israel, Jamaica, Japan, the Republic of Korea, Peru, the Philippines, Romania, Singapore, South Africa, Thailand, and the British Virgin Islands.

60.     Per the FDA's December 17, 2025 update: "All ByHeart infant formula products have been recalled, and these products should not be available for sale in stores or online. This includes all formula cans and single-serve 'anywhere pack' sticks."

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

Page 26

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

61.     On December 12, 2025, the FDA sent warning letters to four major retailers, including Target Corporation, for failing to remove recalled ByHeart infant formula from their store shelves despite being notified of the recall.

62.     On December 15, 2025, the FDA issued a press release and reminded industry of its legal duties regarding food recalls under the Federal Food, Drug, and Cosmetic Act, and asked companies to follow best practices when carrying out recalls.

63.     Despite these repeated notifications, the FDA received reports that recalled formula was still being found on store shelves in multiple states, including at multiple Walmart, Target, and Kroger locations, and at one or more Sprouts Organic Market, Safeway, Jewel-Osco, Shaw's, and Star Market locations.

64.     Specifically, on November 19, 2025, the FDA held a call with Target Corporation to discuss the ineffectiveness of the recall within its stores. During this discussion, the FDA requested actions Target Corporation was prepared to implement to ensure recalled product was no longer available for purchase at Target stores nationwide.

65.     Despite follow-up emails from the FDA on November 20, 21, 24, and 26, 2025 and December 1, 3, and 8, 2025, Target Corporation did not provide the FDA with any information demonstrating that corrective actions to effectuate the recall were implemented throughout Target Corporation to prevent adulterated food from being received in interstate commerce and subsequently offered for sale.

66.     The inadequacy of Target Corporation's recall response was further demonstrated on November 20, 2025, when Arkansas state partners observed ByHeart Whole Nutrition Infant Formula single-serve "anywhere pack" sticks on a Target store shelf with promotional "Sale!" signage offering a $2.00 discount on the recalled formula from November 16 to November 22,

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

2025. This observation indicates not only Target's failure to remove recalled infant formula from store shelves, but the active promotion and discounted sale of a recalled infant formula product implicated in an infant botulism outbreak.

### A.B.'s *Botulism* Illness

67.     A.B. was born on September 29, 2025, at St. Joseph's Medical Center in Stockton, California. A.B. is the first child of Plaintiffs Anthony Barbera (father) and Thalia Flores (mother).

68.     During August 2025, A.B.'s parents purchased five (5) 24-ounce cans of ByHeart formula and one ByHeart "anywhere pack" through ByHeart's website and at two Target store locations: 10424 Trinity Parkway, Stockton, California 95219, and 2355 W. Kettleman Lane, Lodi, California 95242. Specifically, on August 20, 2025, Plaintiffs ordered one 24-ounce can and one 8.4-ounce anywhere pack online at ByHeart.com; on August 23, 2025, Plaintiffs purchased two 24-ounce cans in-store at Target; and on August 29, 2025, Plaintiffs purchased two additional 24-ounce cans in-store at Target.

69.     Upon his arrival home, A.B. was fed ByHeart infant formula exclusively. The formula was prepared using distilled water. All of his bottles were washed and sterilized after each use.

70.     As the month of October 2025 progressed, A.B. would consume three to four ounces of mixed formula (1.5 to 2 scoops of ByHeart powdered formula) consistently every three hours.

71.     On October 22, 2025, A.B. was seen by one of his pediatricians for a routine check-up and procedure. A full physical examination was performed and no issues or concerns were identified. A.B.'s weight was measured at 9 pounds.

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

72.    On October 23, 2025, A.B.'s parents started noticing that A.B. was taking longer to finish his usual three-ounce bottle. By the evening, he was barely consuming a two-ounce bottle every three hours.

73.    On October 24, 2025, A.B.'s intake had dropped to less than one ounce every three hours; his cries were less frequent and weaker than normal, and his urine output was decreasing.

74.    On the morning of October 25, 2025, A.B.'s parents called his pediatrician, who advised them to seek emergency medical attention. Around 10:30 a.m., they arrived at the St. Joseph's Medical Center Emergency Room in Stockton, California.

75.    The emergency room physicians performed a physical examination of A.B. and noted his weak cry, his inability to latch onto a bottle, and his dehydration. The decision was made to admit A.B. to the hospital overnight for further observation.

76.    As the evening progressed, A.B.'s condition deteriorated significantly. He became increasingly lethargic and less responsive. Multiple nurses attempted to feed him, but he was only able to consume between 5 ml and 13 ml of mixed formula at each feeding.

77.    During the early morning hours of October 26, 2025, a comprehensive examination was performed by a pediatric critical care physician. Key findings from the physician's examination included: A.B.'s mother stated that A.B.'s present cry, facial expression, alertness, body habitus, and strength were significantly depressed, even compared to when she brought A.B. to the emergency room on the morning of October 25; the examination showed tachycardia at rest (160s, occasionally over 170); on neurological examination, with much stimulation (including toe pinching), the physician woke A.B. enough to get him to make a repetitive weak moaning cry, A.B. waved his arms at bed level (very little strength against gravity) and withdrew his feet from painful stimuli, demonstrated weak recoil strength, and demonstrated

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

completely floppy head, trunk, and lower extremities when raised by his arms or when supported in sitting or standing positions, with facial muscles symmetric but lax, especially around the mouth, which hung open when A.B. was held upright; A.B. was struggling to open his eyes and his mother stated he was unable to open his eyes fully; A.B.'s suck was very weak and poorly effective; A.B.'s muscle strength rating for his upper and lower extremities was approximately 3/5 and 2/5, respectively; and A.B. presented with bilateral eye crusting, which could be indicative of being unable to shut his eyes completely due to muscle weakness.

78.    Later that morning, the medical team met with A.B.'s parents to discuss their collective assessments. The medical team indicated that the most probable diagnosis was botulism, but that it could not rule out various other differential diagnoses including, but not limited to, spinal muscular atrophy (SMA Type 1) or a metabolic disorder. A.B.'s medical team consulted with a specialist at the California Department of Public Health's Infant Botulism Treatment and Prevention Program, who advised that A.B. be treated immediately with the BabyBIG antitoxin.

79.    At this point, A.B.'s parents were frightened and very concerned for A.B.'s health given the severity of the prognosis for botulism and the various other differential diagnoses indicated by the medical team. A.B.'s parents were especially concerned that A.B. might have spinal muscular atrophy given the similarities of spinal muscular atrophy's clinical presentation to amyotrophic lateral sclerosis, with which A.B.'s maternal grandmother had been diagnosed earlier in the year. Upon the advice and recommendation of A.B.'s medical team, A.B.'s parents made the decision to initiate the order for the BabyBIG antitoxin and proceed with further testing to rule out all other differential diagnoses.

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

80.    Given the severity of these diagnoses coupled with A.B.'s declining condition, the decision was made to transfer him to the neonatal intensive care unit (NICU). A myriad of diagnostic tests and supportive therapies were executed during A.B.'s first day in the NICU, including but not limited to an encephalogram of A.B.'s brain; an echocardiogram of A.B.'s heart; X-rays of A.B.'s chest and abdomen; multiple blood tests; urine and tissue cultures; and the insertion of a high-flow nasal cannula in A.B.'s nose to deliver supplemental oxygen.

81.    The abdominal X-ray indicated that A.B. was severely constipated. Despite the constipation, a stool sample needed to be obtained and sent for laboratory testing in order to confirm the botulism diagnosis.

82.    For A.B.'s parents, it was heartbreaking to watch A.B.'s medical team administer multiple sterile, non-bacteriostatic water enemas throughout the day, with A.B. barely having the strength to respond. By late that Sunday, A.B.'s medical team was finally able to secure a small stool specimen, which was sent to the California Department of Public Health for testing.

83.    Around 11:00 p.m. on October 26, 2025, the BabyBIG antitoxin arrived and was administered to A.B. By this point, A.B. was in an extremely fragile state as he was no longer eating, was connected to multiple IV lines and monitors, and was so weak that he could no longer cry. Watching A.B. in this condition was agonizing for A.B.'s parents; they felt utterly helpless and could only cling to the hope that the BabyBIG antitoxin would save him.

84.    A.B.'s condition began to marginally improve by the evening of October 27, 2025. A feeding tube was inserted through his mouth as a precaution, and he remained constipated with no bowel movements. A.B.'s parents were contacted by the California Department of Public Health for a background interview to determine the source of A.B.'s exposure to botulism.

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

85.    On October 28, 2025, A.B.'s condition continued to show small signs of improvement, and he started to fully open his eyes. A.B. continued to be extremely constipated with no bowel movements. At the end of the day, A.B.'s parents were still awaiting laboratory test results to confirm A.B.'s diagnosis of either botulism, SMA Type 1, or a metabolic disorder.

86.    On the morning of October 29, 2025, A.B.'s parents were notified that A.B.'s stool specimen had tested positive for botulism type A. As the day progressed, the doctor discontinued the supplemental oxygen delivered through A.B.'s high-flow nasal cannula. A.B.'s weight was measured at 8 pounds 10 ounces, a concerning decrease from the 9 pounds he weighed one week prior.

87.    On October 30, 2025, A.B.'s parents were contacted again by an epidemiologist with the California Department of Public Health. The epidemiologist indicated that the California Department of Public Health would be interested in testing all of A.B.'s open cans of ByHeart formula for botulism. A.B.'s parents collected and provided two opened 24-ounce cans of ByHeart formula (Use By 01 Dec 2026, BYHEART 206VABP 13:33:36 251261P2, approximately 20% remaining; and Use By 01 Dec 2026, BYHEART 206VABP 12:50:58 251131P2, approximately 80% remaining) to the California Department of Public Health, which received them on November 4, 2025. A third 24-ounce can (Use By 01 Dec 2026, BYHEART 206VABP 20:52:43 251131P2), unopened with the foil seal intact, remains in A.B.'s parents' possession.

88.    From October 31, 2025 through November 6, 2025, each day A.B. continued to show small, steady signs of improvement. A.B. was discharged from the hospital on November 7, 2025.

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

89.    It is still too early to say what the short-term and long-term impacts of A.B.'s recovery will be. He continues to be constipated and has irregular bowel movements. He is also slowly building back up to three-ounce bottles.

### IV.    CAUSES OF ACTION

### COUNT I
### STRICT PRODUCT LIABILITY

90.    Plaintiffs incorporate herein by reference the allegations contained in each preceding paragraphs as though fully set forth herein.

91.    At all relevant times, Defendants were the manufacturers, processors, suppliers, distributors, and/or sellers of the adulterated food product that is the subject of this action, and each of them placed that product, or a component part of that product, into the stream of commerce.

92.    Defendants ByHeart and Dairy Farmers of America each manufactured, produced, processed, and/or supplied the subject infant formula or a component part of it. Defendant Target Corporation was a retail seller in the chain of distribution of the subject infant formula and is strictly liable, along with the other Defendants, for injuries caused by defects in the product it placed in the hands of the consuming public.

93.    The adulterated food product that Defendants manufactured, processed, distributed, and/or sold was, at the time it left each Defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *Clostridium botulinum* spores. The product contained a manufacturing defect in that it differed from the manufacturer's intended result and deviated in a material way from otherwise identical units of the same product line.

---

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL                    Page 33

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

94.     The adulterated food product that Defendants manufactured, processed, distributed, and/or sold was delivered to Plaintiffs without any substantial change in its defective condition. The adulterated food product was used in the manner expected and intended, and was consumed by A.B.

95.     When it left Defendants' control, the adulterated food product was not fit for human consumption, was not reasonably safe in construction, and was not free of pathogenic bacteria or other substances injurious to human health.

96.     The adulterated food product failed to perform as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner, and the product's design and condition were a substantial factor in causing A.B.'s injuries.

97.     Plaintiffs suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that Defendants manufactured, processed, distributed, and/or sold.

## COUNT II

### BREACH OF EXPRESS AND IMPLIED WARRANTIES

98.     Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

99.     Defendants are liable to Plaintiffs for breaching express and implied warranties that they made regarding the adulterated food product that Plaintiffs purchased and/or that Defendants supplied into the stream of commerce. These express and implied warranties included the implied warranties of merchantability and fitness for a particular purpose recognized under California Commercial Code sections 2314 and 2315. Specifically, Defendants expressly warranted, through their sale and supply of food to the public and by the statements and conduct

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

Page 34

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

of their employees and agents, that the food they manufactured, processed, distributed, and sold was fit for human consumption and not otherwise adulterated or injurious to health.

100. Plaintiffs allege that the botulism spore-contaminated food that Defendants sold and/or supplied would not pass without objection in the trade and was therefore in breach of the implied warranty of merchantability.

101. Plaintiffs allege that the botulism spore-contaminated food that Defendants sold and/or supplied was not fit for the uses and purposes intended—i.e., human consumption, and specifically consumption by an infant as the infant's sole or primary source of nutrition—and that this product was therefore in breach of the implied warranty of fitness for its intended use.

102. To the extent privity of contract would otherwise be required, no such requirement applies here because this action concerns foodstuffs sold for human consumption, and because A.B. was a foreseeable user of the product and a member of the class of persons the warranties were intended to protect.

103. As a direct and proximate result of Defendants' breach of warranties, as set forth above, Plaintiffs sustained injuries and damages in an amount to be determined at trial.

## COUNT III

## NEGLIGENCE

104. Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

105. Defendants owed to Plaintiffs a duty to use reasonable care in the manufacture, processing, distribution, storage, and sale of their food product, the exercise of which duty would have prevented or eliminated the risk that Defendants' food products would become contaminated with botulism spores or any other dangerous pathogen. Defendants breached this duty.

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

106.    Defendants had a duty to comply with all statutes, laws, regulations, and safety codes pertaining to the manufacture, processing, distribution, storage, and sale of their food product, but failed to do so, and were therefore negligent. Plaintiffs are among the class of persons designed to be protected by these statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, processing, distribution, storage, and sale of similar food products.

107.    Defendants had a duty to properly supervise, train, and monitor their respective employees, and to ensure their compliance with all applicable statutes, laws, regulations, and safety codes pertaining to the manufacture, processing, distribution, storage, and sale of similar food products, but they failed to do so, and were therefore negligent.

108.    Defendants had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances, and regulations, and that were clean, free from adulteration, and safe for human consumption, but they failed to do so and were therefore negligent.

109.    Defendant Target Corporation further owed a duty to use reasonable care in responding to the recall of the subject infant formula, including a duty to promptly and effectively remove recalled product from its shelves and to cease offering it for sale. As alleged above, Target Corporation breached that duty.

110.    As a direct and proximate result of Defendants' acts of negligence, Plaintiffs sustained injuries and damages in an amount to be determined at trial.

THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Page 36

**MARLER CLARK**
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

## COUNT IV

## NEGLIGENCE PER SE

111.    Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

112.    Defendants had a duty to comply with all applicable state and federal statutes and regulations intended to ensure the purity and safety of their food product, including the requirements of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 *et seq.*) and its California equivalents, including but not limited to the Sherman Food, Drug, and Cosmetic Law, California Health and Safety Code sections 109875 *et seq.*, and in particular sections 110545, 110620, 110625, and 111825, which prohibit the manufacture, sale, delivery, holding, or offering for sale of any food that is adulterated.

113.    Defendants failed to comply with the provisions of the health and safety statutes identified above, and, as a result, were negligent *per se* in their manufacture, processing, distribution, and sale of food adulterated with botulism spores.

114.    Pursuant to California Evidence Code section 669, Defendants' failure to exercise due care is presumed because they violated the statutes and regulations identified above; that violation proximately caused A.B.'s injuries; those injuries resulted from an occurrence of the nature that the statutes and regulations were designed to prevent; and Plaintiffs are among the class of persons for whose protection those statutes and regulations were adopted.

115.    As a direct and proximate result of conduct by Defendants that was negligent *per se*, Plaintiffs sustained injury and damages in an amount to be determined at trial.

## V.    DAMAGES

116.    Plaintiffs have suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of Defendants, in an amount that shall

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

be fully proven at the time of trial. These damages include but are not limited to damages for general pain and suffering, both past and future; damages for loss of enjoyment of life, both past and future; medical and medical-related expenses, both past and future; loss of wages and income sustained by Plaintiffs Anthony Barbera and Thalia Flores in caring for A.B., both past and future; emotional distress, past and future; pharmaceutical expenses, both past and future; and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

117.    For judgment against Defendants, and each of them, on the First Cause of Action in such sums as shall be determined to fully and fairly compensate Plaintiffs for all general, special, incidental, and consequential damages incurred, or to be incurred, as the direct and proximate result of the acts and omissions of Defendants, in an amount to be proven at trial;

118.    For judgment against Defendants, and each of them, on the Second Cause of Action in an amount that is fair and reasonable, to be proven at trial;

119.    For judgment against Defendants, and each of them, on the Third Cause of Action in an amount that is fair and reasonable, to be proven at trial;

120.    For judgment against Defendants, and each of them, on the Fourth Cause of Action in an amount that is fair and reasonable, to be proven at trial;

121.    For prejudgment interest as allowed by law;

122.    For Plaintiffs' costs of suit herein incurred, disbursements, and reasonable attorneys' fees as allowed by law;

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

123. For leave to amend or modify the provisions of this Complaint as necessary or appropriate after additional or further discovery is completed in this matter; and

124. For such other and further relief as this Court may deem just and proper.

## VII.    DEMAND FOR JURY TRIAL

125. Plaintiffs demand a trial by jury on all issues so triable with the maximum number of jurors permitted by law.

DATED: This 20th day of July, 2026

QUIRK LAW FIRM, LLP

BY: /s/ Trevor Quirk
Trevor Quirk (SBN: 241626)
877 S Victoria Ave, Suite 111
Ventura, CA 93003
Tel: (805) 650-7778
Fax: (866) 728-7721
tmq@qlflaw.com

MARLER CLARK, INC., P.S.

BY: /s/ William D. Marler
William D. Marler
(admitted *Pro Hac Vice*)
180 Olympic Drive S.E.
Bainbridge Island, Washington 98110
Tel: (206) 346-1888
Fax: (206) 346-1989
bmarler@marlerclark.com

*Attorneys for Plaintiffs*

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of July, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/Joanne Ischer

THIRD AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL

MARLER CLARK
THE FOOD SAFETY LAW FIRM
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
(800) 884-9840
bmarler@marlerclark.com